FILED IN OPEN COURT
ON  8-19-15  BRH
Julie Richards Johnston, Clerk
US District Court
Eastern District of NC

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:15-CR-232-1F(4)

NO. 5:15-CR-232-2F(4)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **I N D I C T M E N T** |
| | ) | |
| GREGORY DUSTIN GOULDMAN | ) | |
| JASON DEAN | ) | |

The Grand Jury charges that:

## INTRODUCTION

### I.  GREGORY DUSTIN GOULDMAN's CAREER AT POLK CORRECTIONAL INSTITUTION.

1.  Polk Correctional Institution (hereinafter "Polk") is a state prison operated by the North Carolina Department of Public Safety (hereinafter "NC-DPS").  Polk opened for operation in Butner, North Carolina, on November 15, 1997.  According to the NC-DPS official website, Polk, which was originally named "Polk Youth Institution," was initially intended "to process newly admitted youthful offenders between the ages of 19 and 21."  However, in October of 1998, a "high security maximum control unit" (hereinafter "HCON") was opened at Polk.  According to the NC-DPS official website:

1

This high security concept in correctional design is intended for the state's most violent and assaultive offenders. The 'Supermax' (HCON) unit in Butner was the first of its kind in North Carolina.

2. Inmates incarcerated on the HCON unit at Polk are held in solitary confinement. These inmates are fed in their cells and limited to one hour of recreation per day in an empty room adjacent to their cells. During such recreation, and at all other times, the inmates are not allowed to interact with other inmates in HCON. Inmates at Polk, both in HCON and otherwise, are prohibited from possessing tobacco products, alcohol, matches and lighters, United States currency, illegal drugs (including, without limitation, marijuana), cellular telephones, and more than a specifically permissible number of batteries.[1]

3. In 2005, GOULDMAN was hired as a Correctional Officer at Polk. From 2005 through approximately 2008, GOULDMAN was assigned responsibility for a variety of areas in Polk. From approximately 2008, through approximately 2011, GOULDMAN served as a Captain's Clerk.

4. In approximately December of 2011, GOULDMAN was promoted to Sergeant and assigned to the Operations Unit at

_____

[1]Inmates in HCON are allowed to purchase small radios and electric razors from Polk, along with a small number of batteries to be used in such radios and razors. Inmates are not allowed to stockpile batteries.

2

Polk. In approximately August of 2012, GOULDMAN was assigned to HCON as Sergeant in charge of the night shift in H-CON. GOULDMAN worked in this capacity from that date until September of 2014. As Sergeant, GOULDMAN was in charge of a number of HCON Correctional Officers during his shifts on HCON. Due to his position as Sergeant, GOULDMAN was also able to have contact with inmates without having a second person present.

## II. POLK/HCON RULES AND REGULATIONS.

5. As noted above, HCON inmates are kept in solitary confinement and are not allowed to have certain contraband items. In addition, HCON inmates are prohibited from passing notes (often referred to as "kites") to other inmates and from passing other items, such as books. HCON inmates are also prohibited from blocking their windows from the view of the hallway.

6. Correctional Officers throughout Polk are prohibited from bringing alcohol, tobacco, illegal drugs, and cellular telephones into Polk. Notwithstanding these prohibitions, GOULDMAN and other guards would smuggle cigarettes and alcohol into Polk for their personal use.

7. In response to HCON inmates throwing feces and urine at Correctional Officers, a practice referred to as "gas" or "gassing," HCON guards, notwithstanding prohibitions to the

3

contrary, began to appease inmates by passing kites and other items between inmates. Inmates were also allowed to block up the window view from the hallway into their cells. It was also apparent from odors in the hallways of HCON and other locations in Polk, that some inmates were obtaining and smoking marijuana.

### III. GOULDMAN's MISUSE OF POSITION IN EXCHANGE FOR FINANCIAL BENEFITS.

#### A. GOULDMAN's Involvement with Inmate One.

8. No later than early 2014, GOULDMAN reached an arrangement under which he agreed to use his position as Sergeant to smuggle cigarettes to an HCON inmate (hereinafter "Inmate One") in exchange for United States currency. In order to effectuate such scheme, GOULDMAN would wait until it became dark outside and then go out to his car and retrieve the cigarettes. GOULDMAN would then deliver the cigarettes to Inmate One in exchange for $50 per pack.

9. In approximately February of 2014, GOULDMAN agreed to provide Inmate One with a cellular telephone. GOULDMAN purchased a TracFone from the Dollar Store for $7 and smuggled it into Polk. In exchange for delivering the phone to Inmate One, GOULDMAN received $300. Because the phone did not work well, GOULDMAN agreed to meet Inmate One's girlfriend at a gas station on North Carolina Highway 50 near Butner, North Carolina, to receive a package to smuggle into the Polk to Inmate One.

4

GOULDMAN used a disposable TracFone to contact Inmate One's girlfriend in order to avoid creating a trail of evidence tying him to Inmate One's girlfriend. GOULDMAN received the package and smuggled it into Inmate One in exchange for $425. The package contained a cellular phone, United States currency, two packs of cigarettes, and a cigar. GOULDMAN was paid through electronic "Green Dot" money transfers. The account number relating to the electronic transfers were texted to GOULDMAN from Inmate One. In order to avoid leaving evidence of Green Dot transfers into GOULDMAN's main checking account, GOULDMAN transferred the Green Dot payments to his Pay Pal account and then made a Pay Pal transfer into his main checking account.

10. GOULDMAN later agreed to smuggle marijuana to Inmate One. GOULDMAN, pursuant to Inmate One's instruction, met a man at a BP Gas Station on Blue Ridge Road near Crabtree Mall in Raleigh, North Carolina. GOULDMAN received a sock filled with marijuana and a "couple hundred bucks" in payment for his assistance in smuggling the marijuana to Inmate One. GOULDMAN stole some of the marijuana and smoked it, packing the remaining marijuana in a cigarette pack, which he smuggled into Polk and delivered to Inmate One.

11. Subsequent to the meeting at BP Gas Station, GOULDMAN met the same man in front of Macy's at Triangle Town Center in

5

Raleigh, North Carolina, and received another package. This package contained marijuana and $400 (which was payment for GOULDMAN's assistance in the smuggling scheme). GOULDMAN stole some of the marijuana and smuggled the remaining marijuana to Inmate One. In this instance, GOULDMAN was able to smuggle the marijuana into Polk by simply carrying it in his pockets. Upon arriving at HCON, GOULDMAN got a towel from the clothes house, wrapped the marijuana in the towel, and then delivered the towel to Inmate One.

**B. GOULDMAN's Involvement with Inmate Two.**

12. In addition to Inmate One, GOULDMAN began smuggling contraband into Polk for a second unrelated HCON inmate (hereinafter "Inmate Two"). Pursuant to his arrangement with Inmate Two, GOULDMAN used his TracFone to arrange for a package pickup from a female courier. GOULDMAN received a $200 cash payment from Inmate Two, which Inmate Two had passed through a vent in his cell into the maintenance closet behind his cell. GOULDMAN met the female courier in the parking lot at Polk and was given a Wendy's Restaurant bag containing two cheeseburgers. GOULDMAN brought the bag into work under the ruse that it was his dinner and then, upon opening the cheeseburgers, found a coin wrapper filled with marijuana in each cheeseburger.

6

GOULDMAN delivered the marijuana to Inmate Two by concealing it in the next day's laundry delivery.

13. GOULDMAN met the female courier on a second occasion in the parking lot at Polk and received a Subway Restaurant bag containing a wrapped submarine sandwich. GOULDMAN brought the bag into work under the ruse that it was his dinner and then, upon opening the sandwich, discovered two cellular telephones that had been wrapped in electrical tape. GOULDMAN delivered the cellular phones to Inmate Two by concealing them in a pair of socks that he delivered to Inmate Two. Inmate Two agreed to pay GOULDMAN $600 in exchange for smuggling the two cellular phones into Polk.

14. Subsequent to the two deliveries to Inmate Two described above, GOULDMAN received a call from the front guard shack at Polk that a female had arrived with a dinner delivery. GOULDMAN went to the guard shack and received a WalMart bag containing a Subway sandwich, a large bottle of Cheerwine soda, and a large bag of Lay's potato chips. The female who made the delivery was different from the person GOULDMAN met on previous occasions. In addition, GOULDMAN was not provided with any advance notice of such delivery. GOULDMAN brought the bag into work under the ruse that it was his dinner and then, upon opening the large bag of Lay's potato chips, discovered two

7

cellular telephones, two packs of cigarettes duct-taped together with matches, and two packs of AA batteries which are used by inmates to make cellular phone charging devices. GOULDMAN delivered the contraband to Inmate Two.

## C. **GOULDMAN's Involvement with Inmate Three**.

15. After being reassigned from HCON to Polk's Processing Unit in September of 2014, GOULDMAN began smuggling contraband to an inmate prison barber (hereinafter "Inmate Three"). GOULDMAN agreed to charge $25 for each pack of cigarettes, with an understanding that Inmate Three would need a large supply of cigarettes. Consequently, GOULDMAN began smuggling in cartons of cigarettes inside of his winter coat. GOULDMAN would then conceal the carton inside the bottom of a box of latex gloves and then deliver the box of latex gloves to the barber shop, where latex gloves are commonly used during haircuts.

16. GOULDMAN, who was no longer willing to take "Green Dot" credit from inmates, informed Inmate Three that he wanted "green backs, not Greendots," in exchange for smuggling items to Inmate Three. As a result, GOULDMAN received cash payments in exchange for the contraband delivered to Inmate Three. GOULDMAN received some cash directly from Inmate Three, but was primarily paid through drop-offs by females GOULDMAN would meet at various businesses located near Polk. GOULDMAN met one female on at

8

least two occasions at a local Subway Restaurant in order to receive cash payments relating to amounts owed by Inmate Three. On January 21, 2015, GOULDMAN met a former female Correctional Officer at Polk, who was discharged from Polk due to an inappropriate relationship with Inmate Three, at a Wendy's Restaurant in Butner, North Carolina. During this meeting, GOULDMAN was given a package containing a cash payment and a marijuana blunt cigarette. GOULDMAN delivered the blunt to Inmate Three.

17. In order to assist Inmate Three in hiding the contraband that was being smuggled into Polk by GOULDMAN, GOULDMAN provided Inmate Three with a container of superglue for use in resealing non-contraband items in which the contraband was being concealed.

### III. JASON DEAN's MISUSE OF POSITION TO OBTAIN PROPERTY OF ANOTHER.

18. In September of 2014, JASON DEAN, defendant herein, was hired as a Correctional Officer at Polk. Several years prior to being hired at Polk, DEAN worked at Hard Times Jewelry & Pawn in Henderson, North Carolina. DEAN was assigned to work under the direct supervision of GOULDMAN, who had been moved from HCON to inmate processing. GOULDMAN showed DEAN how to sneak in cigarettes and smoke them during DEAN's shift at Polk.

9

19. On or about February 9, 2015, DEAN, using his official position as Correctional Officer, received a custom made gold teeth grill (hereinafter "Gold Grill") from an inmate. The Gold Grill was shaped in the form of teeth, with fangs, and was designed to fit over the inmate's natural teeth. DEAN failed to turn the contraband in to his superiors or to complete an official form, as required by Polk procedures. Instead, DEAN secreted the Gold Grill out of Polk.

20. On February 18, 2015, DEAN traveled to Hard Times Jewelry & Pawn and sold the Gold Grill for $35. The official receipt for the transaction reads as follows: "Grill-10K."

21. In early 2015, DEAN approached Inmate Three and offered to sell him cigarettes. Although Inmate Three provided a cash payment of $200 to DEAN for cigarettes, DEAN failed to ever deliver the cigarettes.

22. The allegations set forth in the foregoing Introduction are hereby incorporated by reference into each count of this Indictment and re-alleged therein.

10

## COUNT ONE

### [Extortion Under Color of Official Right;
### 18 U.S.C. § 1951]

From in or about 2012, to in or about May, 2015, in the Eastern District of North Carolina and elsewhere, GREGORY DUSTIN GOULDMAN, defendant herein, knowingly attempted to and did obstruct, delay, and affect commerce by extortion, in that GOULDMAN obtained property, namely, money and other things of value, from inmates at Polk Correctional Institution in Butner, North Carolina, with the inmates' consent, under color of official right, in violation of Title 18, United States Code, Section 1951.

## COUNT TWO

### [Extortion Under Color of Official Right;
### 18 U.S.C. § 1951]

From in or about September, 2014, to in or about March, 2015, in the Eastern District of North Carolina and elsewhere, JASON DEAN, defendant herein, knowingly attempted to and did obstruct, delay, and affect commerce by extortion, in that DEAN obtained property, namely, money and other things of value, from inmates at Polk Correctional Institution in Butner, North Carolina, with the inmates' consent, under color of official right, in violation of Title 18, United States Code, Section 1951.

11

## COUNT THREE

## [False Statement; 18 U.S.C. § 1001]

On or about May 14, 2015, in the Eastern District of North Carolina, JASON DEAN, defendant herein, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully made a materially false, fraudulent, and fictitious statement and representation, that is, DEAN falsely stated to an agent of the Federal Bureau of Investigation that he had not received a gold teeth grill set from an inmate of Polk Correctional Institution in Butner, North Carolina.

All in violation of Title 18, United States Code, Section 1001.

## COUNT FOUR

## [Perjury; 18 U.S.C. § 1623]

1. On or about May 21, 2015, in the Eastern District of North Carolina, JASON DEAN, defendant herein, while under oath and testifying in a proceeding before Grand Jury No. 14-5-1, a grand jury of the United States sitting in the Eastern District of North Carolina, knowingly did make a false material declaration.

12

2. The scope of the Grand Jury's investigation, as to which the false statement was material, is delineated in the Introduction of this Indictment.

3. At the time and place alleged above, DEAN appearing as a witness under oath at said proceeding before the Grand Jury knowingly made the following declaration in response to questions with respect to material matters as alleged above:

Q. You know the significance, I told you about the - - -

A. Yeah.

Q. - - - perjury statute. Did you ever receive anything of value from any inmates?

A. No.

Q. No. So you never received any sort of material that – like, sort of like a grill that might be on somebody's teeth that you could now bring to a pawn shop and pawn?

A. Like I told them [FBI Agents], no.

4. The underscored testimony of DEAN, as he then and there well knew and believed, was false in that DEAN had seized an inmate's gold teeth grill and then sold it to Hard Times Jewelry & Pawn in Henderson, North Carolina.

All in violation of Title 18, United States Code, Section 1623.

13

## FORFEITURE NOTICE

Defendants, GREGORY DUSTIN GOULDMAN and JASON DEAN, are hereby given notice of the provisions of Title 18, United States Code, Section 981 (a)(1)(C), as made applicable herein by Title 28, United States Code, Section 2461(c), that all his interest in all property specified herein is subject to forfeiture. As a result of the foregoing offenses in Counts One and Two of the Indictment, GOULDMAN and DEAN shall forfeit to the United States any and all property constituting, or derived from, any proceeds the said Defendants obtained directly or indirectly as a result of the said offense, and the United States seeks a money judgment for the gross proceeds of the offense.

If any of the above described forfeitable property, as a result of any act or omission of GOULDMAN and/or DEAN,

> (1) cannot be located upon the exercise of due diligence;
>
> (2) has been transferred or sold to, or deposited with, a third person;
>
> (3) has been placed beyond the jurisdiction of the court;
>
> (4) has been substantially diminished in value; or
>
> (5) has been commingled with other property which cannot be subdivided without difficulty;

14

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of GOULDMAN and/or DEAN up to the value of the above forfeitable property.

A TRUE BILL

REDACTED VERSION
Pursuant to the E-Government Act and the federal rules, the unredacted version of this document has been filed under seal.

FOREPERSON

_8/19/2015_
Date

THOMAS G. WALKER
United States Attorney

BY: DENNIS M. DUFFY
Assistant United States Attorney

BY: LESLIE K. COOLEY
Assistant United States Attorney

15